1
2
3
4
5
6
7       IN THE UNITED STATES DISTRICT COURT
8
9       FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11   NXP SEMICONDUCTORS USA, INC.,          No. C 14-1225 SI

12              Plaintiff,                  **ORDER GRANTING DEFENDANTS'**
                                            **MOTIONS TO DISMISS**
13        v.

14   FRANCE BREVETS, S.A.S., *et al.*,

15              Defendants.
     _____/

16

17        On August 22, 2014, the Court held a hearing on defendants' motions to dismiss. For the

18   reasons set forth below, the Court GRANTS the motions and dismisses this case for lack of personal

19   jurisdiction over defendants.

20

21                                **BACKGROUND**

22        On March 14, 2014, plaintiff NXP Semiconductors USA ("NXP USA") filed this declaratory

23   judgment action against three defendants: (1) France Brevets, a French corporation with its principal

24   place of business in Paris, France (2) INSIDE Secure, a French corporation with its principal place of

25   business in Meyreuil, France, and (3) NFC Technology, LLC ("NFCT"), a Delaware limited liability

26   corporation with its principal place of business in Marshall, Texas. NFCT is a wholly-owned indirect

27   subsidiary of France Brevets. The complaint seeks declaratory judgment of non-infringement and

28                                        1

invalidity of U.S. Patents Nos. 6,700,551 ("the '551 patent"), 7,665,664 ("the '664 patent"), and 7,905,419 ("the '419 patent") (collectively, "the Patents in Suit").  The patents-in-suit relate to "near field communication" ("NFC") technology.  NFC is a wireless technology that is used for contactless communication between electronic devices, such as between a smart phone and a terminal, and allows devices such as smart phones to perform many tasks, including unlocking doors, purchasing products, and accessing services remotely.  Compl. Ex. D. The complaint alleges that this action arises from defendants' licensing and enforcement efforts with respect to the patents-in-suit.

Defendants have moved to dismiss this case for lack of personal and subject matter jurisdiction, and improper venue.[1]

## I.      The parties

Plaintiff NXP USA is a Delaware corporation with its principal place of business in San Jose, California.  *Id*. ¶ 2.  NXP USA sells and offers for sale in the United States semiconductor products with NFC capability.  *Id*. ¶ 33.[2]  One of NXP USA's products is the NXP PN544 NFC Communication Controller.  *Id*. ¶ 23.

Defendant France Brevets is a French corporation with its principal place of business in Paris, France.  *Id*. ¶ 3.  France Brevets was created in March 2011 within the framework of a French governmental initiative, the "Programme d'Investissements d'Avenir" (Program of Future Investments).  *Id*. Ex. D; Richards Decl. Ex. 2-4 (Docket No. 49). France Brevets was established with 50% funding from the French government and 50% funding from the Caisse de Dépôts et Consignations (the "CDC").  *Id*. France Brevets is dedicated to patent promotion and monetization in Europe. Compl. Ex. D.  France Brevets does not maintain an office in California.  Bégouin-Grenard Decl. ¶ 3.  France Brevets does not

---

[1]  Only France Brevets and INSIDE Secure contend that there is no subject matter jurisdiction. Because the Court finds that there is no personal jurisdiction over these defendants, the Court does not reach the issue of subject matter jurisdiction.

[2]  At the hearing, counsel for France Brevets asserted that NXP USA does not actually sell semiconductor products, and that other NXP entities sell the products.  This factual dispute is irrelevant to the resolution of the pending motions.

have a registered agent in California. *Id*. ¶ 4. France Brevets is not registered or licensed to do business in California. *Id*. ¶ 2. France Brevets does not own or lease real property in California, or anywhere in the United States. *Id*. ¶ 5. France Brevets does not own or lease tangible personal property in California, or anywhere in the United States. *Id*. ¶ 6. France Brevets does not pay taxes in California, or anywhere in the United States. *Id*. ¶ 7. France Brevets does not have employees in California, or anywhere in the United States. *Id*. ¶ 8. France Brevets does not advertise to California residents, and France Brevets does not pay for any print, radio, television, or any other advertising directed to California residents. *Id*. at ¶ 9. France Brevets does not have any bank accounts in California, or anywhere in the United States. *Id*. ¶ 10.

Defendant NFCT is a Delaware limited liability corporation with its principal place of business in Marshall, Texas. NFCT was formed on November 19, 2013, as a wholly-owned indirect subsidiary of France Brevets. Compl. ¶ 19 and Ex. F.[3] The corporate formation documents for NFCT state that the sole manager of NFCT is France Brevets. *Id*. ¶ 19 & Ex. F. NFCT is not licensed to do business in this district or in California, and NFCT is not doing business this district or in California. Asselot Decl. ¶ 2. NFCT does not maintain an office in California. *Id*. ¶ 3. NFCT does not have a registered agent in California. *Id*. ¶ 4. NFCT is not registered or licensed to do business in California. *Id*. ¶ 5. NFCT does not own or lease real property in California. *Id*. ¶ 6. NFCT does not own or lease personal property in California. *Id*. ¶ 7. NFCT does not pay taxes in California. *Id*. ¶ 8. NFCT does not have employees in California. *Id*. ¶ 9. NFCT does not advertise to California residents, and NFCT does not pay for any print, radio, television, or any other advertising directed to California residents. *Id*. ¶ 10. NFCT does not have any bank accounts in California. *Id*. ¶ 11.

Defendant INSIDE Secure is a French corporation with its principal place of business in Meyreuil, France. Compl. ¶ 4. INSIDE Secure is a designer, developer and supplier of semiconductors, embedded software, and platforms for secure transactions and digital security. *Id*., Ex. D. INSIDE

---

[3] NFCT states that FB Licensing, LLC, a Texas limited liability company, is the whole owner of NFCT, and that France Brevets is the whole owner of FB Licensing, LLC. NFCT's Motion to Dismiss at 10 n.3.

Secure owned the '551 and '664 patents prior to assigning them to NFCT after NFCT's formation, and INSIDE Secure owns the '419 patent.

## II.     Defendants' patent licensing program

In June 2012, France Brevets and INSIDE Secure issued a joint press release announcing the launch of an NFC ("Near Field Communication") patent licensing program. Compl. ¶ 17 & Ex. D. The press release stated that France Brevets will "manage and lead all the efforts under the NFC licensing program," including efforts to license and assert INSIDE Secure's NFC patents. *Id.* In 2013, INSIDE Secure granted to France Brevets "a worldwide exclusive license to grant non-exclusive licenses" of INSIDE Secure's patents included in the NFC Patent Licensing Program. Compl. Ex. E ("NFC Licensing Program Statement"). The NFC Licensing Program Statement states that "France Brevets has full authority to conclude and execute any license agreement with any third party" consistent with the NFC patent licensing program. *Id.*

The complaint alleges "[u]pon information and belief, France Brevets has approached customers of NXP products regarding the licensing and enforcement of patents either assigned to NFCT or assigned to INSIDE Secure and licensed to France Brevets, including the Patents in Suit." Compl. ¶ 22. The complaint alleges, upon information and belief, that France Brevets' licensing efforts have included the presentation of claim charts for infringement of the '551 and '664 patents by products "utilizing a NXP PN544 Communication Controller." *Id.* ¶¶ 23-24. The complaint alleges that "the claim charts contain images of NXP's PN544 product, information derived from the reverse engineering of components of the PN544 product, and excerpts from NXP's documents regarding the PN544 product." *Id.* The complaint also alleges, upon information and belief, that France Brevets' licensing efforts "further included the presentation of information about European Patent No. 1,855,229 and its United States counterpart, the '419 Patent." *Id.* ¶ 25. These licensing efforts included written and verbal communications with United States-based HTC and LG entities. Compl. Ex. H ¶ 22. The HTC entity is a Washington resident, while the LG entities are Delaware and California residents. Compl. Ex. H ¶¶ 2, 5, 6; Exs. 5, 6.

On November 19, 2013, defendant NFCT was formed as a wholly-owned indirect subsidiary of France Brevets. Compl. ¶ 19 and Ex. F.  The complaint alleges that France Brevets formed NFCT solely to hold and litigate one or more of the patents-in-suit in the Eastern District of Texas.  *Id*. ¶¶ 5, 20.  On November 28, 2013, INSIDE Secure assigned the '551 and '664 patents to NFCT.  Compl. ¶ 4 & Ex. G.  The Assignment states that INSIDE Secure "does hereby sell, assign, transfer and confer unto [NFCT] . . . all right, title, and interest that exist today and may exist in the future in and to" the '551 and '664 patents, including all "enforcement rights under, or on account of" the '551 and '664 patents. *Id*. Ex. G.  INSIDE Secure did not assign the '419 patent to NFCT.

On December 5, 2013, NFCT filed a complaint in the Eastern District of Texas asserting the '551 and '664 patents against United States-based HTC and LG entities.  NFCT's complaint alleges that the LG and HTC defendants infringe the '551 and '644 patents because the defendants allegedly sell products "having NXP semiconductor chips and other components with Near Field Communication (NFC) capability." Compl. ¶ 26 & Ex. H ¶¶ 3, 7.  The Texas complaint does not allege infringement of the '419 patent.  The same day, France Brevets filed complaints in Germany against European HTC and LG entities. Compl. ¶¶ 26, 29; Compl. Ex. H; Exs. 7.  France Brevets' German complaints allege infringement of the European patent counterparts to the three patents-in-suit based on the use of NXP-branded controller chips, including NXP's PN544 chip. Compl. ¶ 29; Ex. 7 at 23-24, 68-85, 102-110; Ex. 8 at 23-24, 68-85, 102-110.

On December 9, 2013, France Brevets issued a press release announcing that it had filed "patent infringement lawsuits against LG Electronics and HTC in Germany and in United States for the use of NFC patents in their products." Compl. ¶ 32 & Ex. I.  The press release states that the Texas lawsuit was filed by NFCT, an "affiliate" of France Brevets.  *Id*.  The press release specifically identifies the '551 and '664 patents asserted in the Eastern District of Texas, and quotes France Brevets' managing director as stating that France Brevets is "determined to take steps when [infringement and licensing-related] discussions are not conclusive."  *Id*. Ex. I.

**LEGAL STANDARD**

The parties agree that Federal Circuit law applies to the question of whether personal jurisdiction exists over defendants. *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2002) ("[W]here the personal jurisdictional inquiry is 'intimately involved with the substance of the patent laws,' we apply Federal Circuit law."). Under Federal Circuit law, "before a federal court can exercise personal jurisdiction over a defendant in a federal question case, the court must determine whether an applicable statute potentially confers jurisdiction by authorizing service of process on the defendant, and whether the exercise of jurisdiction would satisfy the requirements of due process." *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1349 (Fed. Cir. 2002).

The "applicable statute" authorizing service of process is the California long arm statute. *See id.* at 1350; Fed. R. Civ. P. 4(e). Because the California long arm statute is coextensive with the limits of due process, "the two inquiries collapse into a single inquiry: whether jurisdiction comports with due process." *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1270 (Fed. Cir. 1998). Before a court may exercise personal jurisdiction over a non-resident defendant, due process requires that the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Plaintiff does not allege that this Court has general personal jurisdiction over any defendant. Instead, plaintiff contends that this Court has specific personal jurisdiction over defendants based on events related to the instant dispute. "Where a defendant is not subject to general personal jurisdiction in the forum state, a district court may nonetheless exercise specific personal jurisdiction over the defendant subject to a three part test: (1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair. With respect to the last prong, the burden of proof is on the defendant, which must 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' under the five-factor test articulated by the Supreme Court in *Burger King*." *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009).

"To survive a motion to dismiss in the absence of jurisdictional discovery, plaintiffs need only make a *prima facie* showing of jurisdiction." *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010); *Electronics For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003). "In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Electronics For Imaging*, 340 F.3d at 1349.

## DISCUSSION

### I.     France Brevets' motion to dismiss

Plaintiff contends that this Court has personal jurisdiction over France Brevets in three independent ways: (1) under 28 U.S.C. § 1330, which provides original jurisdiction over actions against the instrumentalities of foreign states; (2) specific personal jurisdiction based on the patent licensing and enforcement efforts of France Brevets, from which NXP's declaratory relief claims arise; and (3) pursuant to Federal Rule of Civil Procedure 4(k)(2).

### A.     Foreign Sovereign Immunities Act of 1976; agency or instrumentality of a foreign state

NXP USA alleges that this Court has subject matter jurisdiction over its declaratory judgment claims and personal jurisdiction over France Brevets under 28 U.S.C. § 1330(a) and (b)[4] because France Brevets is an agency or instrumentality of a foreign state under 28 U.S.C. § 1603(b), and because this

---

[4] Those sections provide;

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

28 U.S.C. § 1330(a), (b).

action is based on France Brevets' "commercial activity," and thus falls within an exception to foreign sovereign immunity. "Under the [Foreign Sovereign Immunities Act] . . . personal jurisdiction over a foreign state exists where subject-matter jurisdiction exists and where proper service has been made. 28 U.S.C. § 1330(b)." *Altmann v. Republic of Austria*, 317 F.3d 954, 969 (9th Cir. 2002).

The Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq.*, "is the exclusive source of subject matter jurisdiction over all suits involving foreign states or their instrumentalities." *Gupta v. Thai Airways Intel, Ltd.*, 487 F.3d 759, 763 (9th Cir. 2007). Under the FSIA, foreign sovereigns enjoy immunity from suit in a federal or state court unless one of several statutory exceptions apply. *Id.* at 761 n.2, 763; 28 U.S.C. § 1604. Exceptions to the FSIA are set forth in 28 U.S.C. §§ 1605-1607.

Section 1604 of FSIA creates a "statutory presumption that a foreign state is immune from suit." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1124 (9th Cir. 2010). The presumption "applies if it is apparent from the pleadings or uncontested that the defendant is a foreign state." *Id.* at 1125. Otherwise, to trigger the presumption, "the defendant must make a *prima facie* case that it is a foreign state." *Id.* at 1124. After the sovereign establishes a *prima facie* case, "the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Id.* at 1125; *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307 (9th Cir. 1997). When the "plaintiff satisfies her burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Id.* at 1125.[5]

Plaintiff contends that France Brevets is an agency or instrumentality of France. Under 28 U.S.C. § 1603(b), an "agency or instrumentality of a foreign state" is an entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

---

[5] The parties do not address how this framework applies when, as here, it is the plaintiff arguing that the defendant is a foreign state. In this case it is not apparent from the pleadings that the defendant is a foreign state, and defendant argues that it is not. Thus, the Court finds that in order to trigger the presumption, it is plaintiff who must make a *prima facie* case that France Brevets is a foreign state.

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

The first and third factors are not disputed.  At issue is whether France Brevets meets the second factor.  NXP contends that France Brevets meets both prongs of subjection (2) because it is an "organ of a foreign state or political subdivision," and because a majority of France Brevets' shares or other ownership interest is owned by a foreign state or political subdivision.

### 1.    Organ of a foreign state

Plaintiff contends that France Brevets is an organ of the French government.  "In defining whether an entity is an organ, courts consider whether the entity engages in a public activity on behalf of the foreign government.  In making this determination, courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law."  *Patrickson v. Dole Food Company*, 251 F.3d 795, 807 (9th Cir. 2001), *aff'd on other grounds*, 538 U.S. 468 (2003).  "The entity may be an organ even if it has some autonomy from the foreign government."  *Id.*; *see also Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995).  "[T]hat the [state] is not directly involved in the day-to-day activities of [the entity] does not mean that it is not exercising control over the entity. . . . ").  Consistent with Congress's intent, the Ninth Circuit defines "organ" "broadly," noting that,

> "'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a government procurement agency or a department or ministry which acts and is suable in its own name."

*Gates*, 54 F.3d at 1460 (9th Cir. 1995) (quoting H.R.Rep. No. 94-1487 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6614).

In *Patrickson*, companies that were formerly indirectly owned by the Israeli government argued that they were organs of the Israeli government under the FSIA.  The Ninth Circuit held that the

9

companies were not:

> The Dead Sea Companies argue that, like the oil company in *Corporacion Mexicana*, the Companies were government organs created by Israel for the purpose of exploiting the Dead Sea resources owned by the government. The Dead Sea Companies were classified as "government companies" under Israeli law, which gave the government certain privileges reflecting its ownership stake. The government had the right to approve the appointment of directors and officers, as well as any changes in the capital structure of the Companies, and the Companies were obliged to present an annual budget and financial statement to various government ministries. The government could constrain the use of the Companies' profits as well as the salaries of the directors and officers.

> Although Israeli law granted such authority directly to the Israeli government, it is not considerably different from the control a majority shareholder would enjoy under American corporate law. In contrast to the oil refinery in *Corporacion Mexicana* [*de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996)], the Dead Sea Companies were not run by government appointees; their employees were not treated as civil servants; nor were the Companies wholly owned by the government of Israel. The Companies could sue and be sued, and could in fact sue the government of Israel (although official Israeli documents describe such disputes as between "a government company and another government body"). Nor did the Companies exercise any regulatory authority, as did the entity in *Gates* [*v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995)]. These factors support the district court's view of the Companies as independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives. Although the question is close, we hold that the Dead Sea Companies were not organs of the Israeli government, but indirectly owned commercial operations, which do not qualify as instrumentalities under the FSIA.

*Patrickson*, 251 F.3d at 808 (internal footnote omitted).

In contrast, in *California Department of Water Resources v. Powerex Corp. ("Powerex II")*, 533 F.3d 1087 (9th Cir. 2008), the Ninth Circuit held that a government-owned and government-operated electric power distribution company was an organ of British Columbia. The court found that "[t]he 'circumstances surrounding Powerex's creation' weigh in favor of finding Powerex an organ of British Columbia. It owes its very existence to the Province, which instructed BC Hydro [itself a government agency] to establish a subsidiary that would assist it with its sovereign functions." *Id*. at 1099. The court also found significant that "BC Hydro wholly owns Powerex and appoints Powerex's board of directors. That board is made up of inside directors who sit on both BC Hydro's and Powerex's boards, and outside directors who are appointed by the inside directors. Any outside directors—i.e., non-BC Hydro directors—on Powerex's board are subject to the approval of the office of the British Columbia Premier." *Id*. The purpose of Powerex's activities demonstrated its public nature because it was

10

marketing surplus power from the BC Hydro system, "the precise mission originally dictated by the Province's Ministry of Energy, Mines, and Petroleum Resources." *Id.* at 1100. In addition, "[u]nder the direction of the Provincial government, Powerex fulfills the goals of the Power for Jobs Development Act, the purpose of which is 'to help ensure that British Columbia's electric power resources contribute to the creation and retention of jobs in British Columbia and to regional economic development.'" *Id.* Powerex was also involved in sovereign functions such as treaty formation and implementation, and "Powerex was to serve as the vehicle for the Province's now-abandoned attempt to create an auction market for electricity trading." *Id.* The court noted that Powerex was restrained by provincial regulations and directives applicable to government corporations, that the Province could limit Powerex's ability to enter banking and other financial arrangements, and that Powerex's financial operations were reviewed by the Province's comptroller general. *Id.* at 1101. The court found that "[a]lthough Powerex may enjoy a limited degree of tactical independence, its purposes and strategies—indeed, its continued existence—are determined by the Province." *Id.* Finally, the Ninth Circuit noted that Powerex did not pay federal or provincial income tax, which was a special privilege under Canadian law, and that Powerex's profits were entirely rebated directly or indirectly to British Columbia. *Id.* at 1102.

Similarly, in *Gates v. Victor Fine Foods*, the Ninth Circuit held that a Canadian marketing board established pursuant to Canadian law as exclusive marketing agent for the sale of hogs in the Province of Alberta was an agency or instrumentality of Canada. The court found it significant that a governmental body called the Alberta Agricultural Products Marketing Council played an active supervisory role over the board, including the fact that "the Council may authorize the board to issue regulations requiring [hog] producers, among other things, to produce according to quotas, to furnish information relating to the production and marketing of specified products, and to pay service charges." *Gates*, 54 F.3d at 1461. The Ninth Circuit also noted that Canadian law "establishes a mechanism whereby a producer who is dissatisfied with a board decision can appeal to an appellate body appointed by the Minister. . . . In this way the board resembles an administrative agency." *Id.* (internal citations omitted). Further, board members were immune "from liability for acts performed in good faith in

carrying out their duties, a protection normally afforded to governmental actors." *Id.* (internal citation omitted); *see also Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (holding Mexican oil refinery was an organ of Mexico where it was entirely owned by the government, controlled by government appointees, employed only public servants, and had the exclusive responsibility for refining and distributing Mexican government property).

The Court concludes that France Brevets is more similar to the "heavily regulated" but "independent commercial enterprises" in *Patrickson* than the entities in *Powerex II*, *Gates*, and *Corporaction Mexicana*, and thus that France Brevets is not an "organ or instrumentality" of the French state. Certain aspects of France Brevets' creation and structure do weigh in favor of finding that it is an organ or instrumentality of France, such as the facts that France Brevets was created pursuant to a French public initiative with funding from the French government and the CDC (itself, as discussed *infra*, an agency of the French government). In addition, France Brevets has an eight-member Board of Directors, consisting of four representatives from the French Republic and four representatives from CDC, *see* Bégouin-Grenard Decl. ¶ 13, and similar to the companies in *Patrickson* and *Gates*, the Board exercises supervisory authority such as the authority to appoint and dismiss the Director General of France Brevets, as well as the authority to approve the annual budgets and business plans proposed by the Director General. Auchter Decl. Ex. F at § 4.1. At the same time, however, France Brevets was established as a standard limited liability company under French law, and counsel stated at the hearing that France Brevets does not enjoy any special tax status in France and that it pays taxes to France. Further, France Brevets is a distinct juridical entity that is authorized to sue and be sued in its name, and unlike the *Powerex II* utility or the *Gates* marketing board, France Brevets does not exercise regulatory authority in France. Bégouin-Grenard Decl. ¶ 14. The stated operating methodology of France Brevets is as follows:

> France Brevets shall acquire licensing rights to patents through research establishments and entities and through private companies located in France or abroad. Its purpose is to build a broad portfolio of intellectual property rights, enhance their value by combining them in technological clusters and organize their marketing in the form of licenses to European and global businesses.

*Id.* ¶ 1.2. Thus, France Brevets is more similar to a private company acting to maximize profits, as

1  opposed to an arm of the state conducting sovereign functions such as treaty negotiation and

2  implementation or distributing government resources.   In addition, although France Brevets pays

3  dividends to the French state, France Brevets also operates as a private corporation by paying royalties

4  to the patent owners "after compensation for the equity committed by France Brevets." *Id.*  ¶¶ 2.4, 4.3.

5  Finally, France Brevets does not employ civil servants, Bégouin-Grenard Decl. ¶ 16, which is an

6  additional factor in support of the finding that France Brevets is not an organ of the French government.

7      Accordingly, the Court concludes that France Brevets is not an organ of the French state.

8

9              **2.       Majority of shares owned by a foreign state or political subdivision**

10      Alternatively, plaintiff contends that France Brevets is an agency or instrumentality of a foreign

11  state because a majority of France Brevets' shares or other ownership interest is owned by France or

12  French political subdivision.  France Brevets is 50% owned by France and 50% owned by the CDC.

13  NXP USA argues that the CDC is a political subdivision of France, and therefore that France Brevets

14  is wholly owned by the government of France.

15      The CDC was created by Chapter X of the Finance Act of April 28, 1816.  Richards Decl., Ex

16  18. The CDC describes itself as "a long-term investor serving France's public interest and economic

17  development.  It operates businesses in four different sectors: banking services, savings funds, the

18  pensions and solidarity sector and regional development."  Auchter Decl. Ex. B at 7.  The French

19  Parliament "exercises control over [the CDC's] activities and guarantees its autonomy." Richards Decl.,

20  Ex. 18.  The Parliament exercises this dual mission through a thirteen-member supervisory committee

21  comprised of four members of the French Parliament, a representative of the Highest Administrative

22  Court, two representatives from the Court of State Auditors, the Governor of the Bank of France, the

23  Director of the French Treasury, and three "qualified figures" appointed by the heads of the French

24  Chamber of Deputies and the French Senate. Richards Decl., Ex. 21.  The supervisory board "monitors

25  the management of [the CDC], making comments to the Chairman and Chief Executive Officer to

26  inspire his management, without him being obliged to apply them."  *Id*.  The Chief Executive Officer

27  also takes an oath to "defend the establishment's autonomy and to guarantee the inviolability of funds

28

13

entrusted to it."  Docket No. 51, Ex. E.  The 1816 law further provides that the Chief Executive Officer

is personally and financially responsible for the management of the funds conferred upon the CDC.

Richards Decl., Ex., 18.

"The term 'political subdivisions' includes all governmental units beneath the central

government, including local governments."  H.R. Rep. No. 94-1487 (1976), at 15, *reprinted in* 1976

U.S.C.C.A.N. 6604, at 6613.  To determine whether the CDC is a foreign state (or political subdivision

thereof) as opposed to an agency and instrumentality of a foreign state, the Court applies the "core

functions" test, which examines whether the entity is "an integral part of a foreign state's political

structure or, by contrast, an entity whose structure and function is predominantly commercial.'"[6]

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Sys.,*

*Inc.* ("*Ministry of Defense*"), 495 F.3d 1024, 1035 (9th Cir. 2007) (internal quotation marks omitted),

*rev'd on other grounds*, *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*

*v. Elahi*, 556 U.S. 366 (2009).  In *Ministry of Defense*, the Ninth Circuit held that the Iranian Ministry

of Defense was part of the Iranian state and not an instrumentality because "the powers to declare and

wage war are so intimately connected to a state's sovereignty." 495 F.3d at 1035.  The Ninth Circuit

found that there was no evidence that the ministry was a "separately constituted legal entity" distinct

---

[6] The FSIA treats foreign states (and political subdivisions) and instrumentalities of foreign states differently with respect to the scope of immunities provided and service of process.  As the Ninth Circuit has noted,

> Congress seemed exceedingly conscious of the distinction between foreign states, political subdivisions, and agencies or instrumentalities of foreign states and political subdivisions.  It could easily have stated that an entity must be owned by a foreign state, a political subdivision or an agency or instrumentality of a foreign state or political subdivision.  It did not.  Moreover, a contrary reading of the statute could expand immunity far beyond what Congress intended.  As it is written, the Act provides potential immunity to entities that are either organs of a foreign state or political subdivision thereof or have a majority of shares owned by the foreign state or political subdivision.  To add to that list entities that are owned by an agency or instrumentality would expand the potential immunity considerably because it would provide potential immunity for every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision.

*Gates*, 54 F.3d at 1461.

14

from the Iranian state:

> [The plaintiff] has not established that MOD is "primarily responsible for its own finances," that it is run as a "distinct economic enterprise," that it operates with "independence from close political control," or that it exhibits any of the traits – other than the capacity to sue and be sued – that the Court has identified as characteristic of a "separately constituted legal entity." [*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec )*, 462 U.S. 611, 624 (1983).] As such, Elahi has failed to overcome the presumption that MOD constitutes an inherent part of the state of Iran.

*Id*. at 1035-36.

Other courts have similarly held that government departments and ministries are political subdivisions under the FSIA. *See e.g.*, *Magness v. Russian Fed'n*, 247 F.3d 609, 613 (5th Cir. 2001) (Russian Ministry was a "political subdivision," but the Russian State Diamond Fund was a government agency that was not a political subdivision); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000) (describing Yemeni Ministry of Supply & Trade as political subdivision of Yemen for purposes of determining legal status of entity controlled by Ministry); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 150 (D.C. Cir. 1994) (Bolivian Air Force was a foreign state and not instrumentality); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (Iranian Ministry of Foreign Affairs was a foreign state and not instrumentality ); *Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006) (Polish Ministry of the Treasury was a foreign state, rather than an agency or instrumentality, because its core function was "to hold and administer the property of the Polish state," which was "indisputably governmental.").

The Court concludes that the CDC is not an integral part of France's political structure, but rather that its structure and function is predominantly commercial, and that it operates with a significant degree of independence from France.  As an initial matter, the Court notes that the CDC has already been held to be an instrumentality of France, see *Freund v. The Republic of France*, 592 F. Supp. 2d 540, 555 (S.D.N.Y. 2008), and plaintiff has not cited any cases holding that the CDC is a political subdivision of France. While France exercises some degree of control and involvement in the CDC through the supervisory board, French law guarantees the autonomy of the CDC, and the CEO of the CDC is personally and legally responsible for the CDC's finances. Thus, the record shows that the CDC

1    is "primarily responsible for its own finances," that it is run as a "distinct economic enterprise," that it

2    operates with "independence from close political control." *See Ministry of Defense*, 495 F.3d at 1035-

3    36; *Bancec*, 462 U.S. at 624.

4          Plaintiff cites *O'Connell Machinery Co. v. M.V. "Americana"*, 734 F.2d 115 (2d Cir. 1984), for

5    the proposition that financial entities can be political subdivisions.  However, the Court does not hold

6    that a financial entity cannot, as a matter of law, be a political subdivision under the FSIA, and instead

7    simply holds that under the facts of this case plaintiff has not shown that the CDC is a political

8    subdivision of France.  In addition, *O'Connell Machinery* contains very little information about the

9    entity at issue except for the fact that it was "under the direct control of the Istituto per la Ricostruzione

10   Industriale, a public financial entity which coordinate[d] the management of the commercial enterprises

11   of the Italian Government," *id*. at 116, and thus *O'Connell Machinery* is not helpful to this Court's

12   analysis regarding the characterization of the CDC.[7]

13

14        **B.        Specific personal jurisdiction**

15        Alternatively, NXP USA contends that the Court has jurisdiction over France Brevets under

16   ordinary principles of specific personal jurisdiction.  In a declaratory judgment action, "[t]he relevant

17   inquiry for specific personal jurisdiction purposes then becomes to what extent has the defendant

18   patentee 'purposefully directed [such enforcement activities] at residents of the forum,' and the extent

19   to which the declaratory judgment claim 'arises out of or relates to those activities.'" *Avocent Huntsville

20   Corp. v. Aten Intern. Co., Ltd.*, 552 F.3d 1324, 1332 (quoting *Breckenridge Pharm., Inc. v. Metabolite

21   Labs., Inc*., 444 F.3d 1356,1363 (Fed. Cir. 2006).  A declaratory judgment claim "neither directly arises

22   out of nor relates to the making, using, offering to sell, selling, or importing of arguably infringing

23   products in the forum, but instead arises out of or relates to the activities of the defendant patentee in

24   enforcing the patent or patents in suit." *Id*. at 1332.  In addition, "the mere sale of defendant's products

25   _____

26          [7] As the Court has concluded that France Brevets is not an agency or instrumentality of France,
     the Court finds it unnecessary to reach the parties' arguments regarding whether the commercial activity
27   exception to foreign sovereign immunity applies here.

28                                                    16

1    – whether covered by the patents in suit or not – is not sufficient to establish specific personal

2    jurisdiction in a declaratory judgment suit." *Id.* at 1338.

3            The Federal Circuit has long held that a letter threatening litigation is an insufficient basis for

4    asserting personal jurisdiction over a patent holder. *See, e.g.*, *Inamed Corp. v. Kuzmak*, 249 F.3d 1356,

5    1361 (Fed. Cir. 2001) ("We have, however, repeatedly held that the sending of an infringement letter,

6    without more, is insufficient to satisfy the requirements of due process when exercising jurisdiction over

7    an out-of-state patentee."). Thus, "[f]or the exercise of personal jurisdiction to comport with fair play

8    and substantial justice, there must be 'other activities' directed at the forum and related to the cause of

9    action besides the letters threatening an infringement suit." *Silent Drive, Inc. v. Strong Indus., Inc.*, 326

10   F.3d 1194, 1202 (Fed. Cir. 2003). The Federal Circuit has found personal jurisdiction "where such

11   'other activities' in some identifiable way 'relate to' enforcement of those patents in the forum."

12   *Avocent*, 552 F.3d at 1334.

13           Examples of these "other activities" include initiating judicial or extra-judicial patent
            enforcement within the forum, or entering into an exclusive license agreement or
14          other undertaking which imposes enforcement obligations with a party residing or
            regularly doing business in the forum. *See Campbell Pet Co. v. Miale*, 542 F.3d 879,
15          886 (Fed. Cir. 2008) (finding jurisdiction over a patentee whose "extra-judicial
            patent enforcement," namely, enlisting a third party to remove defendant's products
16          from a trade show that was being held in the forum state, went beyond merely
            informing the defendant of its alleged infringement); *Breckenridge* [*Pharmaceutical,
17          Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006)] ("Here,
            in addition to sending letters into the forum state, . . . Metabolite has entered into an
18          *exclusive license* with PamLab, a company that . . . conducts business in Florida."
            (emphasis added)); *Silent Drive* [*Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1202
19          (Fed. Cir. 2003)] (noting that " *[e]xclusive license agreements* with respect to the
            patents at issue with residents of the forum . . . have, at least in some circumstances,
20          been held sufficient to confer personal jurisdiction" (emphasis added)); *Inamed*
            [*Corp. v. Kuzmak*, 249 F.3d 1356, 1361 (Fed. Cir. 2001)] (finding jurisdiction over
21          a patentee who had previously "granted [the plaintiff] *an exclusive license* to practice
            the inventions claimed in the [relevant] patents" (emphasis added)); *Red Wing Shoe*
22          [*Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1362 (Fed. Cir. 1998)]
            (noting that in *Akro*, "[i]n light of the patentee's substantial contacts with its
23          *exclusive licensee*, this court determined that the patent was a sufficient nexus
            between the contacts and the cause of action to establish 'specific jurisdiction.'"
24          (emphasis added)); *Genetic Implant Sys.* [*Inc. v. Core-Vent Corp.*, 123 F.3d 1455,
            1458 (Fed. Cir. 1997)] (finding jurisdiction over a patentee who "contracted with [an
25          exclusive distributor] to sell [the] patented products in [the forum State]" where the
            agreement was "*analogous to a grant of a patent license*" (emphasis added)); *Viam*
26          [*Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 430 (Fed. Cir. 1996)]
            (finding jurisdiction where "according to their own submission to this court, [the
27          defendants] have initiated *a suit seeking to enforce the same patent* that is the subject

28                                                    17

of this suit against other parties, unrelated to this action, in the same district court" (emphasis added)); *Akro* [*Corp. v. Luker*, 45 F.3d 1541, 1543, 1548-49 (Fed. Cir. 1995)] (finding jurisdiction over patentee who had *exclusively licensed* the plaintiff's local competitor to practice the relevant patent, where the license agreement also "oblige[d] [the patentee] '*to defend and pursue any infringement* against' the [relevant] patent" (emphasis added)).

*Id.*

Plaintiff contends that there is specific personal jurisdiction over France Brevets (and the other defendants as France Brevets' agents and/or alter egos) because France Brevets is "directing a public patent enforcement campaign directed at products sold by NXP, a resident of California, and customers that use NXP-branded products, including at least one already-sued California customer." Opp'n to France Brevets' Mtn. at 14:18-20. Plaintiff argues that France Brevets' enforcement efforts are directed, at least in part, towards California because "France Brevets' press release announcing NFCT's lawsuit publicly trumpets this litigation affecting California residents, thereby threatening potential sales for NXP – a California resident." *Id.* at 16:18-20. In addition, plaintiff notes that the same press release also announced that France Brevets' licensing efforts targeted the LG entities sued by NFCT, and that those LG entities include a California resident with offices in San Diego and San Jose who were "previously provided written and verbal notice of the NFC Technology Patents as well as LG's infringement of each such patent." *Id.* at 16:23-25 (quoting press release). Plaintiff argues that these "other contacts" are sufficient to establish personal jurisdiction.

The Court disagrees. "[E]nforcement activities taking place outside the forum state do not give rise to personal jurisdiction in the forum . . . ." *Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 792 (Fed. Cir. 2011); *Avocent*, 552 F.3d at 1339 ("We are aware of no precedent that holds that the filing of a suit in a particular state subjects that party to specific jurisdiction elsewhere."). In *Radio Systems*, a Delaware corporation with its principal place of business in Tennessee filed a declaratory relief action in Tennessee against a New Jersey corporation. The plaintiff argued that the Tennessee court had specific jurisdiction over the nonresident defendant because the defendant's president had sent letters, e-mails, and made phone calls to the Tennessee corporation in an effort to license the defendant's patent; the defendant's president traveled to Tennessee to meet with the plaintiff to demonstrate the defendant's

18

product; the defendant sent cease-and-desist e-mails and letters to Tennessee threatening litigation; and the defendant contacted the PTO (in Virginia) to alert the examiner for the plaintiff's pending application of the existence of the defendant's patent, resulting in the withdrawal of a notice of allowance previously issued for the plaintiff's application. *Id*. at 788, 790-92.

The Federal Circuit held that these contacts were insufficient.  The court held that some of the contacts, including the trip by the defendant's president to Tennessee, related to attempts to commercialize or license the patent, and such contacts do not give rise to a declaratory judgment action. *Id*. at 790.  The court also held that under long-standing Federal Circuit precedent, the cease and desist letters and e-mails were not, on their own, sufficient to establish personal jurisdiction.  *Id*. at 791.  With regard to the defendant's contacts with the PTO, the court held that "Accession's contacts with the PTO d[o] not support Radio Systems' jurisdictional argument because those contacts were directed at Virginia (the site of the PTO) rather than Tennessee." *Id*. at 792; *cf. Electronics for Imaging*, 340 F.3d at 1351 (finding personal jurisdiction over nonresident defendant where, *inter alia*, defendant had hired an attorney in the forum state to assist with enforcement of its patent rights and the attorney, as the agent for the defendant, engaged in communications with the plaintiff relating to the enforcement of the patent).

Here, all of the enforcement efforts occurred overseas, such as the issuance of the France Brevets press release and the filing of the German lawsuit, or – assuming that NFCT is France Brevets' alter ego/agent, and thus imputing NFCT's contacts to France Brevets – in Texas.  The only alleged connection to California is attenuated:  plaintiff alleges that defendant's enforcement activities will be felt in California because NXP is a California resident, and that NXP may lose sales as a result of NFCT's lawsuit against NXP's customers, one of whom is a California resident.  Plaintiff does not cite any authority holding that there is specific personal jurisdiction in such circumstances, and to the contrary, Federal Circuit case law strongly suggests otherwise.  Further, two judges from the Northern District have held, under very similar facts, that there is no personal jurisdiction over a nonresident defendant based upon the defendant filing infringement lawsuits outside of California.  *See Key Source Intern. v. CeeColor Industries, LLC*, C 12-1776 WHA, 2012 WL 6001059, at *3-4 (N.D. Cal. Nov. 30,

2012) (dismissing declaratory relief action against nonresident defendant for lack of personal jurisdiction where defendant sent cease and desist letters to resident plaintiff and sued plaintiff for infringement in Delaware); *Juniper Networks, Inc. v. SSL Servs., LLC*, No. C 08-5758 SBA, 2009 WL 3837266, at *4 (N.D. Cal.  Nov. 16, 2009), *aff'd without opinion*, 404 Fed. App'x 499 (Fed. Cir. Dec. 13, 2010), *reh'g denied* (Jan. 31, 2011) ("Tellingly, Juniper cites no authority to support its novel argument that the act of filing a lawsuit against an alleged California resident – in a Texas district court – is sufficient to make a prima facie showing that it has purposefully availed 'itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'").

Accordingly, the Court concludes that plaintiffs has not made out a *prima facie* case of specific personal jurisdiction.

### C.    Rule 4(k)(2)

Plaintiff also contends that this Court has personal jurisdiction over France Brevets pursuant to Federal Rule of Civil Procedure 4(k)(2). That rule provides,

> (2) Federal Claim Outside State-Court Jurisdiction.  For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. Proc. 4(k)(2).  "Thus, for a court to exercise personal jurisdiction over a defendant under that rule, the plaintiff's claim must arise under federal law, the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction, and exercise of jurisdiction must comport with due process."  *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1412 (Fed. Cir. 2009).  "The third requirement under Rule 4(k)(2) – the due process analysis – contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sets."  *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip Medico*, 563 F3d 1285, 1295 (Fed. Cir. 2009) (finding jurisdiction under Rule 4(k)(2) over foreign defendant where contacts with the United States included "attendance at trade

shows, purchases of parts and a machine, the sale of a product for a veterinary application to one customer, and a pair of consultations about product development" and jurisdiction was reasonable and fair because, *inter alia*, defendant had traveled to United States repeatedly and plaintiff alleged that defendant imported infringing product into United States). The Federal Circuit has held that "the purposes of Rule 4(k)(2) are best achieved when the defendant is afforded the opportunity to avoid the application of the rule only when it designates a suitable forum in which the plaintiff could have brought suit. The advisory committee was concerned with defendants escaping jurisdiction in U.S. federal courts while still having minimum contacts with the United States." *Touchcom*, 574 F.3d at 1415.

Plaintiff argues that this case arises under federal law because this is a declaratory judgment patent case and that France Brevets appears to contend it is not subject to jurisdiction anywhere in the United States. Plaintiff argues that the third element is satisfied because "France Brevets' and its alter ego's contacts with United States generally, when combined with its conduct directed at California, establish personal jurisdiction under Rule 4 (k)(2))." Opp'n to France Brevets' Mtn. at 19:21-22. Plaintiff's arguments regarding the third element are essentially the same as its specific jurisdiction arguments, namely that "France Brevets manages the patent licensing program, under which it has threatened United States companies using NXP-branded products, obtained exclusive rights to United States patents, is asserting United States patents, and is gathering information to bring infringement claims against NXP." *Id*. at 19:23-20:4.

France Brevets asserts that it does not have sufficient minimum contacts with the United States to create personal jurisdiction anywhere, but that if the Court determines that France Brevets has minimum contacts with this country, the Eastern District of Texas is the appropriate venue. The Court agrees. As discussed above, France Brevets did not take any action in California, nor does plaintiff allege that France Brevets itself – as opposed to its alleged alter ego/agent NFCT – has engaged in any conduct in the United States giving rise to this declaratory judgment action. To the contrary, all of France Brevets' conduct occurred overseas. Even assuming that NFCT is France Brevets' alter ego or agent, at the very most that would support a finding of personal jurisdiction in the Eastern District of Texas, not California. Plaintiff has not demonstrated that France Brevets has sufficient minimum

1    contacts with the United States such that it would be fair and reasonable for this Court to exercise

2    personal jurisdiction over France Brevets.

3

4    **II.     NFCT's motion to dismiss**

5         Plaintiff contends that this Court has specific personal jurisdiction over NFCT because NFCT

6    is an alter ego and/or agent of France Brevets.[8]  For the reasons set forth above, the Court lacks personal

7    jurisdiction over France Brevets, and thus even assuming that NFCT is an alter ego and/or agent of

8    France Brevets, the Court also lacks personal jurisdiction over NFCT.  Plaintiff's reliance on *Google*

9    *Inc. v. Rockstar Consortium U.S. LP*, C 13-5933 CW, 2014 WL 1571807 (N.D. Cal. Apr. 17, 2014), is

10   misplaced because in that patent declaratory judgment action, Judge Wilken held that there was specific

11   jurisdiction over nonresident defendants because "Google has shown that it is likely that Defendants

12   have created continuing obligations with a forum resident to marshal the asserted patents such that it

13   would not be unreasonable to require Defendants to submit to the burdens of litigation in this forum."

14   *Id.*  at *7.

15        Plaintiff also requests the opportunity to conduct jurisdictional discovery regarding NFCT's

16   relationships with France Brevets and INSIDE Secure.  Plaintiff also proposes to seek documents and

17   testimony regarding the governance, officers, and employees of NFCT, and plaintiff states that it

18   believes that such discovery will establish that NFCT's employees are all associated with and

19   compensated by France Brevets. Plaintiff states that it would also seek documents and testimony

20   reflecting NFCT's licensing and enforcement efforts.  *See* Opp'n to NFCT's Mtn. at 14:16-21.

21   Defendant opposes such discovery on the ground that it is unnecessary because plaintiff has failed to

22   make a *prima facie* showing of personal jurisdiction.

23        The Federal Circuit reviews "the district court's denial of discovery, an issue not unique to patent

24   law, for abuse of discretion, applying the law of the regional circuit." *Autogenomics Inc.*, 566 F.3d at

25   1021-22 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006)).  In the Ninth Circuit,

26   _____

27        [8]   Plaintiff has apparently abandoned the allegation that NFCT is itself an agency or
     instrumentality of a foreign state.  *See* Compl. ¶ 7.

28                                                      22

"discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)).  "A trial court may deny jurisdictional discovery when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction, or where the request for discovery is based on little more than a hunch that it might yield jurisdictionally relevant facts."  *Nuance Communications, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235-36 (Fed. Cir. 2010) (citing and quoting Ninth Circuit case law, internal citations and quotation marks omitted).

Here, the proposed jurisdictional discovery regarding the relationship between the defendants, as well as regarding the structure and governance of NFCT, would not be helpful because even assuming an alter ego or agency relationship amongst the defendants, there are no contacts by any defendant with this forum that give rise to plaintiff's claims. With regard to the proposed discovery on NFCT's licensing and enforcement efforts, plaintiff has not asserted any basis for believing that NFCT has such contacts in California that could provide a basis for specific personal jurisdiction.  Accordingly, the Court exercises its discretion and DENIES plaintiff's request to conduct jurisdictional discovery.

### III.    Defendant Inside Secure's motion to dismiss

#### A.    Specific jurisdiction

Plaintiff contends that France Brevets and NFCT are INSIDE Secure's agents, and thus that their contacts can be imputed to INSIDE Secure for purposes of specific personal jurisdiction.[9]  As an initial matter, the Court notes that the complaint does not allege that NFCT is an agent of INSIDE Secure, and only alleges in a conclusory fashion that France Brevets is an agent of INSIDE Secure. More importantly, even assuming an agency or alter ego relationship, neither France Brevets nor NFCT has

---

[9] Plaintiff has apparently abandoned the argument that specific jurisdiction over INSIDE Secure can be based on INSIDE Secure's California subsidiary's contacts with California.  *Compare* Compl. ¶ 10 (alleging as basis for personal jurisdiction that "Additionally, upon information and belief, INSIDE Secure has a United States subsidiary with its principal place of business at 555 Twin Dolphin Drive, Suite 620, Redwood City, California.") *with* Opp'n to INSIDE Secure's Mtn. at 7 n.5 (plaintiff states that it "is not alleging alter ego or agency with regard to INSIDE Secure's California subsidiary.").

contacts with California giving rise to this declaratory relief action, and therefore even if their contacts are imputed to INSIDE Secure, there is no basis for specific personal jurisdiction over INSIDE Secure. Further, for the reasons stated above, plaintiff's request for jurisdictional discovery is DENIED.

### B.      Rule 4(k)(2)

Plaintiff also contends that there is personal jurisdiction over INSIDE Secure pursuant to Rule 4(k)(2).  INSIDE Secure contends that Rule 4(k)(2) is inapplicable because 35 U.S.C. § 293, the patent long-arm statute, provides for personal jurisdiction in the Eastern District of Virginia for claims involving infringement or validity of the patents it owns.  35 U.S.C. § 293 provides,

> Every patentee not residing in the United States may file in the Patent and Trademark Office a written designation stating the name and address of a person residing within the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder. If the person designated cannot be found at the address given in the last designation, or if no person has been designated, the United States District Court for the Eastern District of Virginia shall have jurisdiction and summons shall be served by publication or otherwise as the court directs. The court shall have the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentee were personally within the jurisdiction of the court.

35 U.S.C. § 293.

Plaintiff does not dispute that it could have brought its declaratory relief claims regarding the '419 patent against INSIDE Secure in the Eastern District of Virginia.  Rule 4(k)(2) is inapplicable where there is "a suitable forum in which the plaintiff could have brought suit."  *Touchcom*, 574 F.3d at 1403.  Accordingly, plaintiff has not demonstrated that this Court has personal jurisdiction over INSIDE Secure pursuant to Rule 4(k)(2).

///

24

## CONCLUSION

For the reasons stated in this order, the Court concludes that it lacks personal jurisdiction over defendant's, and accordingly GRANTS defendants' motions to dismiss. This order resolves Docket Nos. 25, 35 & 40.

**IT IS SO ORDERED.**

Dated: September 15, 2014

_____
SUSAN ILLSTON
United States District Judge

25